UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Jon W. Larochelle, Jr.,
        Plaintiff

        v.                              Case No. 14-cv-479-SM
                                        Opinion No. 2017 DNH 091
N.H. Department of Corrections;
Jennifer L. Goduti; Scott Harrington;
and Michael McAlister,
        Defendants


                        **O R D E R**


        Jon Larochelle claims that while he was on parole status

and under the supervision of the New Hampshire Department of

Corrections, his assigned alcohol and drug counselor, defendant

Jennifer Goduti, coerced him into a sexual relationship.  He

says she did so, at least in part, by threatening to send him

back to prison and by plying him with drugs and alcohol.  In his

amended complaint, Larochelle advanced 15 claims, in which he

asserted that various defendants (including Goduti) violated his

common law and constitutionally protected rights.


        By prior order, the court dismissed all but one of

Larochelle's claims against the State Defendants - Chief Parole

and Probation Officer Scott Harrington, his direct supervisor,

Director of Field Services, Michael McAlister, and the New

Hampshire Department of Corrections (the "NHDOC").
Specifically, the court dismissed Larochelle's claims that the
State Defendants are vicariously liable for Goduti's wrongful
conduct, as well as his claims that those defendants are liable
for having failed to properly supervise Goduti and for having
negligently trained (and retained) her as an employee – failures
Larochelle claimed proximately caused violations of various
constitutional rights. What remains against those defendants is
a single common law negligence claim, in which Larochelle
asserts that the State Defendants knew or should have known that
Goduti was "either engaged in a sexual relationship with
[Larochelle] or was sexually harassing him." Amended Complaint
(document no. 16), at para. 166. And, says Larochelle, those
defendants "negligently breached their duty to enforce the rules
and regulations" of the Department of Corrections and
negligently failed to investigate Goduti's improper relationship
with him. Id. at para. 167.

The State Defendants now move the court for summary
judgment on Larochelle's negligence claim. Larochelle objects.
For the reasons discussed, the State Defendants' motion for
summary judgment is granted.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted). Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, if the nonmoving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and summary judgment may be

granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50
(1986) (citations omitted).


So, to defeat a properly supported motion for summary
judgment, the non-movant must support his or her factual claims
with evidence that conflicts with that proffered by the moving
party.  See generally Fed. R. Civ. P. 56(c).  It naturally
follows that while a reviewing court must take into account all
properly documented facts, it may ignore a party's bald
assertions, speculation, and unsupported conclusions.  See
Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See
also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing
parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could
believe it, a court should not adopt that version of the facts
for purposes of ruling on a motion for summary judgment.").


## Background

Jon Larochelle is 38 years old, has an extensive criminal
history, and has been in prison for approximately seven of the
last ten years.  He has had a chronic substance abuse addiction
for most of his adult life and has, most frequently, abused
heroin.  Amended Complaint at paras. 42-43.  Although he is
currently incarcerated, at all times relevant to this

proceeding, he was on parole status, under the supervision of the New Hampshire Department of Corrections.

In the fall of 2011, Larochelle was released on parole from the Northern N.H. Correctional Facility, where he had been serving a sentence of approximately 18 months for a parole violation (for drug use/drug dealing). Gerard Lagasse (not a defendant) was assigned to be Larochelle's parole officer. Lagasse worked out of the Manchester Field Services Office, under the supervision of Scott Harrington, the Chief Parole and Probation Officer in the Manchester Office. Harrington, in turn, reported to Director of Field Services, Michael McAlister.

Almost immediately after his release on parole, Larochelle overdosed on heroin. He was revived by his mother and transported to Elliot Hospital. Nevertheless, the decision was made not to charge him with a violation of the terms of his parole. Instead, Officer Lagasse contacted Goduti, a licensed alcohol and drug counselor, to see if she could arrange an emergency referral to a residential drug treatment program. Although Goduti often worked out of the Manchester Field Services Office, she was not employed by that office, nor was she supervised by defendants Harrington or McAlister. Instead,

she was employed by a separate state department: Community
Corrections.

Goduti met with Larochelle, who told her that he did not
believe he needed or would benefit from residential treatment.
Goduti apparently concurred and agreed to refer him to an
"Intensive Outpatient Program" at the Farnum Center.  But,
Larochelle did not meaningfully participate in that program.
And, he continued to use various controlled substances,
including heroin, cocaine, and what he called a "benzo" anti-
anxiety medication given to him by his mother.

On January 17, 2012, Larochelle was arrested by Manchester
Police Officers and detained at the Valley Street Jail.  He was
released from jail on March 6, 2012, and returned to the
community (apparently because neither Goduti nor any employees
of the NHDOC were able to secure him a place in a residential
drug treatment program).  Goduti was, however, able to secure
another place for him in the Farnum Center's Intensive
Outpatient Program, while he waited for a bed in a residential
program.  On March 21, 2012, Goduti reported that she attempted
to contact Larochelle by telephone, but noted that she was
unable to do so because his voicemail box was full (which, based

upon Larochelle's prior conduct, she thought was purposeful).[1]
She also noted that the Farnum Center had notified her that
Larochelle failed to complete his intake forms.  Finally, she
noted that "client would benefit from attending IOP until he
gets into [a] residential" drug treatment program.  For his
part, Larochelle continued to be non-compliant with the terms of
his parole, failed to follow instructions given to him by
various NHDOC employees, and appears to have intentionally made
himself unavailable by telephone.

On May 16, 2012, despite testing positive for opiates,
Larochelle was accepted into the Farnum Center's residential
drug treatment program.  He was, however, quickly expelled from
that program, after it was discovered that he had smuggled
heroin into the facility and provided "false urine tests [by]
using a device hidden in his pants."  Goduti immediately sought,
and soon obtained, a bed for Larochelle at Serenity House.  He
was, however, quickly discharged from that program as well, this
time for abusing prescriptions medications.  In July, he was
arrested and admitted to using heroin and cocaine.  He continued

---

[1]     The New Hampshire Department of Corrections uses a computer
program known as "CORIS" to electronically record communications
and interactions between DOC staff and inmates and parolees.
Goduti's notes about her contacts with Larochelle were recorded
in that system.

to struggle with efforts at drug abstinence and various treatment programs throughout the summer and fall of 2012.

In February of 2013, Larochelle was admitted into a residential drug treatment program at Keystone Hall. Seven days later, however, he was expelled for having smuggled Suboxone into the treatment facility and distributing it to four other residents. That same day – February 13, 2013 – Goduti reported that she received a call from Larochelle, who said he was suicidal and planning to overdose. At her deposition, Goduti testified that Larochelle called her to report that he had been kicked out of the most recent treatment center – something he feared would finally prompt NHDOC officials to revoke his parole. Deposition of Jennifer (Goduti) Dearborn (document no. 53-6) at 115. And, he said that he wasn't going back to prison, so he planned to kill himself. Goduti told him that she had to call an ambulance for him, but he responded, "No, the cops are going to come. I'm going to get arrested." Id. Goduti then contacted Larochelle's mother to see if she could help, but learned that she was too far away to provide any assistance. According to Goduti, the relevant facts unfolded as follows:

> [Larochelle's Mother said] You know, "can you bring
> him to the ER?"

I said, "I can't bring him to the ER.  I'm not
bringing him to the ER."

And she said, "Okay.  I'll come meet you there.  I'm
just going through the Hooksett tolls."

I said, "That's not close enough.  I have to be at
group at 6:00"

She said, "Can you drop him off at his dad's shop?"

So I did.  I put him in my car, and I gave him a 0.3
mile ride down to his father's shop, went into his
father's shop, and said, "Call the police if he
leaves.  He's suicidal."

And I walked off, and I never saw the guy again.

Id. at 116-17.


    Although Goduti reported many of the salient details of

that contact with Larochelle, she failed to disclose that she

had given him a ride in her personal vehicle.  Shortly

thereafter, however, she disclosed that omitted fact to Officer

Lagasse.  He, in turn, immediately reported the conduct to his

supervisor, Chief Probation and Parole Officer Scott Harrington.

Harrington confronted Goduti and asked if it was true that she

had given Larochelle a ride in her personal vehicle.  When she

replied "yes," he responded angrily, "What the fuck's with

that?" and told her "you can tell it to investigations."  Id. at

117-18.  A report of the incident was generated and provided to the Investigations Division of the NHDOC.[2]

A week later, on February 20, 2013, Larochelle apparently became aware that police had an arrest warrant for him on a parole violation and, as he had feared, he was looking at more jail time.  After trying unsuccessfully to check into four different hospitals to avoid arrest, he was taken into police custody in Nashua, at St. Joseph's Hospital, and transported to the New Hampshire State Prison.  Soon after he arrived at the prison, Larochelle met with Andrea Goldberg, the Executive Assistant of the Adult Parole Board.  During that meeting, Larochelle told Goldberg that he and Goduti were having a sexual relationship.  Goldberg immediately contacted Chief Probation and Parole Officer Scott Harrington.  Goldberg and Harrington then met with Larochelle together, and Larochelle repeated his allegations.  Harrington immediately reported Larochelle's allegations to his supervisor, McAlister.  <u>See</u> Affidavit of

---

[2]    Goduti testified that her relationship with Harrington was not particularly "positive" and she believed Harrington did not like her.  <u>See, e.g.</u>, Goduti Deposition at 130, 136.  That perception is consistent with Harrington's strong reaction when he learned Goduti had given Larochelle a ride in her personal vehicle.  It also suggests that if Harrington had been aware of Goduti's alleged sexual relationship with Larochelle and/or that she had allegedly provided Larochelle with controlled substances, he would not have tolerated it in silence, as Larochelle claims.

Scott Harrington (document no. 53-9) at paras. 15-16; Affidavit
of Adrea Goldberg (document no. 53-10) at paras. 6-9. According
to defendants, as a result of Larochelle's claims, Harrington
"withdrew" the several parole violations with which Larochelle
had been charged, Larochelle was released from prison, and he
was returned to parole status.

In the wake of Larochelle's claims, Goduti was removed from
the Manchester Field Office and reassigned to a position at the
New Hampshire State Prison. And, an investigation into
Larochelle's claims was opened. The NHDOC and the New Hampshire
State Police interviewed Larochelle on March 27 and again on
April 18, 2013. The contents of that investigative file, as
well as any conclusions the investigators may have drawn, are
confidential under New Hampshire Law and are not part of the
record in this case.

If Larochelle's claims about his illicit sexual
relationship with Goduti are true, it is not surprising that he
and Goduti would have tried to keep that relationship secret and
neither would have reported it to the State Defendants. Indeed,
Larochelle does not claim that, prior to February of 2013, the
State Defendants had actual knowledge of Goduti's alleged
wrongdoing. Still, says Larochelle, the signs were present and

the State Defendants should have inferred that something was
amiss.

According to Larochelle, the improper aspects of his
relationship with Goduti began in May of 2011, when he claims
Goduti confided that she was "kinda into" him and the two kissed
for the first time. Larochelle did not report that statement or
Goduti's alleged conduct to any of the State Defendants. Later
that month, he claims he met Goduti at a motel, they engaged in
oral sex, and they smoked "K2" (a synthetic cannabis also known
as "spice"). Again, Larochelle does not claim he reported that
incident to the State Defendants or that they were aware of it.
Later that same month, says Larochelle, he and Goduti went to
Massachusetts to have dinner and drinks in celebration of his
birthday (May 17). He claims they returned to New Hampshire
together and had sex for the first time at a hotel in
Manchester. And, says Larochelle, Goduti subsequently feared
that she had become pregnant and went with his sister to
purchase and take a home pregnancy test.[3]

---

[3] That claim is at odds with Goduti's deposition testimony.
In response to an unrelated question (about a text message
intended for a friend who was pregnant and which may have
implied that Goduti was also pregnant), Goduti testified, "I
certainly wouldn't be in a bar drinking if I was pregnant.
Plus, I have an IUD, so I couldn't get pregnant." Goduti
deposition at 166.

Larochelle says that he and Goduti continued to pursue their illicit relationship and frequently met at his mother's house.  Nevertheless, neither Larochelle, nor his mother, nor his sister reported any aspect of Goduti's alleged inappropriate relationship with Larochelle to state officials or local law enforcement, until after the NHDOC and State Police began their investigation into Larochelle's claims.

## Discussion

To prevail on his negligence claim against the State Defendants, Larochelle must "demonstrate that the defendant[s] owe[] a duty to the plaintiff, that [they] breached that duty, and that the breach proximately caused injury to the plaintiff." Lahm v. Farrington, 166 N.H. 146, 149 (2014) (citation omitted). Here, Larochelle asserts that the State Defendants had (and breached) a duty to "enforce the rules and regulations as set forth in the Policy and Procedure Directives of the Defendant Department of Corrections."  Amended Complaint at para. 164. And, says Larochelle, those Policy and Procedure Directives obligated the State Defendants to "investigate allegations that Defendant Goduti was either engaged in a sexual relationship with the Plaintiff, or was sexually harassing him, or was overly familiar with him."  Id. at 167.

The relevant Policy and Procedure Directives ("PPDs")
specifically prohibit any sexual contact between NHDOC staff
members and persons under NHDOC control or supervision:

> Sexual Contact is Prohibited. Conduct by staff
> engaging in or attempting to engage in any act
> including intentional touching either directly or
> through the clothing of a person under departmental
> control with the intent to abuse, humiliate, harass,
> degrade, arouse or gratify the sexual desire of any
> person or physical contact including fondling,
> kissing, indecent exposure or other indecent sexual
> behavior by staff in the presence of a person under
> departmental control is a violation of this policy.

PPD 2.16, V, 17 (document no. 53-13). Those directives go on to
provide that, "Any employee who observes or has knowledge of a
violation of any rule specified in this policy and who willfully
or through negligence fails to report the offense to a
responsible superior is in violation of this policy." PPD 2.16,
V, 21 (emphasis supplied). See also PPD 5.19, V, G, 7 (document
no. 53-14) ("All staff, volunteers, and contractors have a duty
to immediately report any information regarding a sexual
assault, sexual solicitation or sexual coercion known to them.")
(emphasis supplied). For purposes of resolving the State
Defendants' motion for summary judgment, the court has assumed
that those regulations can give rise to a common law duty that
was owed by the State Defendants to Larochelle (the State
Defendants do not argue otherwise). See generally Marquay v.

Eno, 139 N.H. 708 (1995) (discussing the circumstances under
which a state reporting statute can give rise to a private right
of action for its violation).

Pointing to the highlighted language above, the State
Defendants say their duty to report (or even investigate)
alleged incidents of improper sexual contact between an employee
and a person under departmental control is only triggered when
they actually learn of (or reasonably should have learned of)
such conduct.  And, say the State Defendants, as soon as they
became aware of Larochelle's claims about Goduti's inappropriate
relationship with him, they promptly initiated an investigation
– a fact that, they say, is firmly established by the record and
about which there can be no genuine dispute.

Perhaps not surprisingly, Larochelle sees things
differently and says there are genuinely disputed material facts
that must be resolved by a jury - facts he says demonstrate that
the State Defendants should have known of Goduti's allegedly
improper relationship with Larochelle, yet they neglected to
initiate a timely investigation into her conduct.  Specifically,
he points to the following:

    1.    In May of 2012, Larochelle met Goduti at the
          Manchester Field Office, after which they took

the "employees only" elevator to exit the
building.  Goduti allegedly forgot her keys and
had to return to her office.  At that point,
says, Larochelle, his parole officer, Lagasse
"came out of his office and asked why
[Larochelle] was at the employee elevator as it
was [not] the elevator the Parolees use.
[Larochelle] told him [he] had a meeting with
Goduti."  Larochelle Affidavit (document no. 62-
1) at para. 11.  That incident, says Larochelle,
should have prompted Lagasse to believe something
was amiss;

2.   Speculative comments from NHDOC employee Cheryl
     Smith, suggesting that at some point during the
     summer of 2012, she recalls that defendant
     Harrington had a meeting with Goduti about "over
     familiarizing . . . spending, um, too much time
     with, um, parolee offenders" - something Smith
     later supposed may have involved Goduti's
     relationship with Larochelle (Plaintiff's
     Memorandum at 9);

3.   On September 10, 2012, Larochelle told his parole
     officer that Goduti had given him a controlled
     substance (i.e., Percocet) (Id. at 10);

4.   Evidence that Larochelle's parole officer knew
     that Larochelle had obtained Goduti's private
     cell phone number "long before the DOC launched
     any investigation" into Goduti's conduct (Id. at
     10); and, finally,

5.   Larochelle's claim that, as early as July of
     2012, there were rumors among some other parolees
     that Goduti was having an inappropriate
     relationship with Larochelle (Id. at 11).

In short, says Larochelle, there is at least circumstantial

evidence to support his claim that, by the summer or early fall

of 2012, the State Defendants should have known that Goduti was

engaged in an inappropriate relationship with Larochelle - and,

yet, they did not actually open an investigation until February

of 2013, when he first reported his alleged relationship with

Goduti to state officials at the prison.

As the State Defendants correctly point out, much of the

evidence upon which Larochelle relies constitutes inadmissible

hearsay (or double hearsay).  And, the few pieces of admissible

evidence upon which he relies are insufficient to create any

genuine dispute as to the material factual question at issue:

whether the State Defendants knew (or should have known) about

Goduti's alleged relationship with Larochelle before he came

forward with his allegations in February of 2013.  For example,

with respect to the incident when Lagasse saw Larochelle

lingering near the "employee's only" elevator, Larochelle

asserts that Lagasse "had to have known or should have known

about this inappropriate relationship."  Larochelle Affidavit,

at para. 34.  Yet, when he was interviewed by an investigator

for the New Hampshire Department of Corrections, Larochelle

said:

> On the elevator that first time, that was our first
> contact.  She immediately [sic] when we got to her
> car, she forgot her keys upstairs, so we took another
> el . . . I think she like [sic] the elevator ride, so
> we took another elevator ride . . . . ride up, she
> went in her office, had me wait at the elevator door,
> and at that time Gerry Lagasse actually came out and
> saw me standing at the elevator door which isn't in

> direct route of where the inmates . . . I mean
> parolees go.
>
> And he asked me what I was doin' standin' there and I
> said I was waitin' for Jenn, and he goes, "Oh good,
> Ok, you . . . saw Jenn. Good." And, you know he
> <u>didn't know obviously what was going on</u>.

March 12, 2013, Investigative Report of Joel Dinsmoor (document

no. 64-3) at 1 (emphasis supplied).


   Similarly, Larochelle's assertion that he told his parole

officer that Goduti had given him Percocets does not support his

claim that any of the State Defendants should have known about

his claimed improper relationship with Goduti.  Indeed, when

Larochelle was interviewed by an investigator for the Department

of Corrections, he talked about having told Lagasse that Goduti

allegedly gave him the pills, but admitted that the following

day he called Lagasse to apologize for having made the claim and

again admitted that Lagasse had no idea "what was really going

on."  March 12, 2013, Investigative Report of Joel Dinsmoor

(document no. 64-1) at 3.  <u>See also</u> Deposition of Sharon

Larochelle (plaintiff's mother) (document no. 53-11) at 54-55

(noting that Larochelle told Lagasse that Goduti had given him

the drugs, but then "fluffed it off" because he didn't want

Goduti to get in trouble); Affidavit of Jon Larochelle, at para.

28 (explaining that the next day, he retracted his claim,

allegedly because he "feared retribution from Goduti," and, therefore, "called PO Lagasse and apologized.").

Nor does Larochelle's assertion that Lagasse knew that Larochelle had obtained Goduti's private cell phone number support his claim that the State Defendant's should have known about the alleged improper relationship between Larochelle and Goduti. Lagasse testified that it was Goduti who disclosed to him the fact that Larochelle had obtained her private cell phone number and, because she stated that "she did not provide her telephone number to Mr. Larochelle, but rather that he had gotten it improperly," Lagasse "did not consider Ms. Goduti to have engaged in any wrongdoing."[4] Instead, [he] told Ms. Goduti that she should file an incident report about Mr. Larochelle if she felt that his conduct was improper." Affidavit of Gerard Lagasse (document no. 53-3) at para. 7. But, when Lagasse did have reason to believe that Goduti had engaged in inappropriate

---

[4]    In her deposition, Goduti explained how Larochelle came to possess the number to her personal cell phone. She testified that parole officers had both personal cell phones and work cell phones. She did not; she had only her private cell phone. And, she gave that number to various providers so they could reach her in the event of an emergency. Apparently, a staff member at Serenity House did not realize that the telephone number Goduti had provided was to her private cell phone. And, when Larochelle learned that he was being expelled from the program at Serenity House, that staff member gave him Goduti's private cell phone number so he could notify her of the issue. See Goduti Deposition (document no. 53-6) at 60, 63.

conduct – specifically, when he learned she gave Larochelle a
ride in her personal vehicle – he immediately reported the
incident to his superior, CPPO Harrington.  Affidavit of Gerard
Lagasse, at paras. 8-9.

And, finally, that Larochelle's mother and sister knew
about his alleged relationship with Goduti does not imply that
the State Defendants should have known the same.  Similarly, the
fact that Larochelle may have told other parolees about that
relationship, or that other parolees may have speculated about
such a relationship, does not suggest that the State Defendants
should have drawn a similar inference, since Larochelle has
pointed to insufficient evidence to warrant such an inference.
Indeed, the record evidence suggests that, until Larochelle
actually voiced his claims, the State Defendants were wholly
unaware of any of the improper conduct in which Larochelle says
Goduti was engaged.  On the other hand, the record is clear that
when those defendants learned of a seemingly minor transgression
by Goduti (giving Larochelle a ride in her personal vehicle
under emergency circumstances), they immediately commenced an
investigation into her conduct.

### Conclusion

Larochelle bears the burden of establishing that the State Defendants knew or should have known about Goduti's allegedly improper conduct prior to the date on which he leveled his accusations against her and, despite such knowledge, failed to undertake an appropriate investigation. Yet, the evidence upon which he relies to carry that burden falls decidedly short. Indeed, it is insufficient even to show that the issue is genuinely disputed. See generally Lorraine Enters., 769 F.3d at 29-30 ("[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party . . . must point to definite and competent evidence showing the existence of a genuine issue of material fact.").

Based upon the evidence upon which Larochelle relies, a reasonable and properly-instructed jury could not, as a matter of law, infer that the State Defendants knew (or should have known) about Goduti's allegedly improper relationship with Larochelle prior to February of 2013 - the date on which he actually revealed those claims to them. Instead, the record demonstrates that as soon as the State Defendants learned of any improper or suspicious conduct on the part of Goduti, they promptly initiated an investigation.

For the forgoing reasons, as well as those set forth in defendants' memoranda, Larochelle has failed to point to sufficient admissible evidence to demonstrate that there are any genuinely disputed material facts on the question of whether, prior to Larochelle's disclosures in February of 2013, the State Defendants knew or should have known that Goduti was engaged in an inappropriate sexual relationship with Larochelle. The State Defendants are, therefore, entitled to judgment as a matter of law on the sole remaining negligence claim against them and their motion for summary judgment (document no. 53) is granted.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

May 5, 2017

cc:    Matthew R. Braucher, Esq.
       Elizabeth A. Lahey, Esq.
       Francis C. Fredericks, Esq.
       Simon R. Brown, Esq.